**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| MISSOURI HOSPITAL ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-CV-04052-BCW |
| | ) | |
| ERIC D. HARGAN, | ) | |
| *Acting Secretary, United States Department of* | ) | |
| *Health & Human Services, et al.*,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are Plaintiff's Motion for Summary Judgment (Doc. #38) and Defendants' Motion for Summary Judgment (Doc. #41). The Court, being duly advised of the premises, grants Plaintiff's motion and denies Defendant's motion.

## BACKGROUND

Plaintiff the Missouri Hospital Association ("the MHA") seeks declaratory relief under the Administrative Procedure Act, 5 U.S.C. § 553, against Defendants the Secretary of the United States Department of Health and Human Services, the Administrator for Medicare & Medicaid Services, and the Centers for Medicare and Medicaid Services ("CMS"), relating to Defendants' calculation of the hospital-specific limit of the Medicaid Disproportionate-Share Hospital program ("DSH"), 42 U.S.C. § 1396, *et seq.*

The MHA alleges five claims against Defendants, as follows: (I) Defendants' online responses to Frequently Asked Questions 33 and 34 ("the FAQs") violate 5 U.S.C. § 706(2)(D) for failure to follow legally required procedures; (II) the policies reflected in the FAQs violate 5 U.S.C. § 706(2)(C) because they are in excess of Defendants statutory authority; (III) the policies

---

[1] Acting Secretary Eric D. Hargan is substituted for Thomas E. Price. Fed. R. Civ. P. 25(d).

reflected in the FAQs violate 5 U.S.C. § 706(2)(A) because they are inconsistent with the unambiguous language of 42 U.S.C. § 1396r-4; (IV) the 2017 version 42 C.F.R. § 447.229 ("the Final Rule") violates 5 U.S.C. § 706(2)(C) because the regulation is in excess of Defendants' statutory authority; and (V) declaratory relief pursuant to 28 U.S.C. § 2201. (Doc. #3).

Initially, the MHA also sought to preliminarily enjoin Defendants from enforcing, applying, or implementing the FAQs and the Final Rule. Thereafter, the parties agreed the motion for preliminary injunction should be stayed, pending resolution of cross-motions for summary judgment. The parties' competing motions for summary judgment were fully briefed on September 8, 2017.

On October 3, 2017, the parties appeared for oral argument on their respective motions. The MHA appeared through counsel, Barbara D.A. Eyman and Robert Ryan Harding. Defendants appeared through counsel, Kristina Wolfe and Matthew N. Sparks.

## UNCONTROVERTED FACTS

In 1965, Congress established the Medicaid Act, 42 U.S.C. § 1396, *et seq.*, to provide federal government financial support to state governments funding medical care for low-income families, the elderly, and persons with disabilities.

State participation in Medicaid is optional. If a state elects to participate, however, it is bound to comply with the Medicaid Act and regulations promulgated by the Secretary of the Department of Health and Human Services.

Each state participating in Medicaid administers its own program under a plan that is subject to prior approval by the Department of Health and Human Services' Centers for Medicare & Medicaid Services ("CMS"). After the state's plan is approved by CMS, the federal government reimburses part of the cost incurred by the state in providing medical treatment to

Medicaid-eligible patients. This general partial federal reimbursement is referred to as federal financial participation ("FFP").

In 1981, Congress amended the Medicaid Act to include the DSH program, 42 U.S.C. § 1396r-4. Under the DSH program, hospitals providing medical care to a "disproportionate share" of Medicaid-eligible individuals could be reimbursed for treatment costs in addition to their FFP.

While states have discretion to determine how to implement the DSH program provisions, Congress has set forth certain statutory limitations. For example, 42 U.S.C. §§ 1396r-4(f) establishes, on a state-by-state basis, the annual maximum amount of DSH program funding that a particular state may receive. A state's specific limit equates to a finite pool of federal DSH program funds within the state, which is allocated among all hospitals within the state that are eligible for DSH program funds. Eligibility for DSH program funds are determined by the state's Medicaid plan, subject to broad federal requirements.

Additionally, 42 U.S.C. § 1396r-4(g)(1)(A) sets forth the annual maximum amount of DSH program funding that a particular hospital may receive. This hospital-specific limit ("HSL") calculation, established by Congress, provides that DSH funds going to a certain hospital may not exceed

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under [the Medicaid Act Chap. 7, Subchapter XIX], other than under this section, and by uninsured patients) by the hospitals to individuals who either are eligible for medical assistance under the State [Medicaid] plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).

In 2003, Congress enacted auditing and reporting requirements for DSH program participants. These added conditions are as follows:

> (j) Annual reports and other requirements regarding payment adjustments

3

With respect to fiscal year 2004 and each fiscal year thereafter, the Secretary shall require a State, as a condition of receiving a payment under section 1396b(a)(1) of this title with respect to a payment adjustment made under this section, to do the following:

(1)     Report

The State shall submit an annual report that includes the following:

(A)     An identification of each disproportionate share hospital that received a payment adjustment under this section for the preceding fiscal year and the amount of the payment adjustment made to such hospital for the preceding fiscal year.

(B)     Such other information as the Secretary determines necessary to ensure the appropriateness of the payment adjustments made under this section for the preceding fiscal year.

(2)     Independent certified audit

The State shall annually submit to the Secretary an independent certified audit that verifies each of the following:

(A)     The extent to which hospitals in the State have reduced their uncompensated care costs to reflect the total amount of claimed expenditures made under this section.

(B)     Payments under this section to hospitals that comply with the requirements of subsection (g) of this section.

(C)     Only the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in paragraph (1)(A) of such subsection are included in the calculation of the hospital-specific limits under such subsection.

(D)     The State included all payments under this subchapter, including supplemental payments, in the calculation of such hospital-specific limits.

(E)     The State has separately documented and retained a record of all of its costs under this subchapter, claimed expenditures under this subchapter, uninsured costs in determining payment adjustments under this section, and any payments made on behalf of the uninsured from payment adjustments under this section.

42 U.S.C. § 1396r-4(j)(1)-(2).

In 2008, CMS issued a rule "set[ting] forth the data elements necessary to comply with the requirements of Section 1923(j) of the Social Security Act (Act) related to auditing and reporting of disproportionate share hospital payments under State Medicaid programs." Medicaid Program; Disproportionate Share Hospital Payments, 73 Fed. Reg. 77904, 77904 (Dec. 19, 2008). This "2008 Rule" states:

§ 447.299 Reporting requirements.

[. . . .]

(c) Beginning with each State's Medicaid State plan rate year 2005, for each Medicaid State plan rate year, the State must submit to CMS, at the same time as it submits the completed audit required under § 455.204, the following information for each DSH hospital to which the State made a DSH payment in order to permit verification of the appropriateness of such payments:

[ . . . .]

(9) Total Medicaid IP/OP Payments. Provide the total sum of items identified in § 447.299(c)(6), (7) and (8)[2]

(10) Total Costs of Care for Medicaid IP/OP Services. The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals. [ . . . .]

(11) Total Medicaid Uncompensated Care. The total amount of uncompensated care attributable to Medicaid inpatient and outpatient services. The amount should be the result of subtracting the amount identified in § 447.299(c)(9) from the amount identified in § 447.299(c)(10). The uncompensated care costs of providing Medicaid physician services cannot be included in this amount.

(12) Uninsured IP/OP revenue. Total annual payments received by the hospital by or on behalf of individuals with no source of third party coverage for inpatient and outpatient hospital services they receive. This amount does not include payments made by a State or units of local government, for services furnished to indigent patients.

(13) Total Applicable Section 1011 Payments. Federal Section 1011 payments for uncompensated inpatient and outpatient hospital services provided to Section

---

[2] Subsection (c)(6) addresses "IP/OP Medicaid fee-for-service (FFS) basic rate payments," (c)(7) addresses "IP/OP Medicaid managed care organization payments," and (c)(8) addresses "Supplemental/enhanced Medicaid IP/OP payments."

1011 eligible aliens with no source of third party coverage for the inpatient and outpatient hospital services they receive.

(14) Total cost of IP/OP care for the uninsured. Indicate the total costs incurred for furnishing inpatient hospital and outpatient hospital services to individuals with no source of third party coverage for the hospital services they receive.

(15) Total uninsured IP/OP uncompensated care costs. Total annual amount of uncompensated IP/OP care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive. [. . . .]

(16) Total annual uncompensated care costs. The total annual uncompensated care cost equals the total cost of care of furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments for inpatient and outpatient hospital services. This should equal the sum of paragraphs (c)(11) and (c)(15) subtracted from the sum of paragraphs (c)(9), (c)(12) and (c)(13) of this Section.

[. . . .]

42 C.F.R. § 447.299(c) (2008); 73 Fed. Reg. at 77950-51. Under this 2008 Rule, if, beginning in 2011, an audit reveals that a particular DSH hospital received federal funds through the DSH program in excess of its statutory HSL, the payments that exceed the HSL are categorized as overpayments, and must either be redistributed to other DSH hospitals within the state, or refunded to CMS.

On January 10, 2010, CMS posted to its website "Additional Information on the DSH Reporting and Audit Requirements," which includes a section containing Frequently Asked Questions and CMS responses.

FAQ 33 asks whether costs associated with patients with both Medicaid and private insurance coverage should be included in the calculation of the DSH limit. CMS's FAQ 33 response is as follows:

Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid utilization rate for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of law resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

http://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf.

FAQ 34 asks whether costs associated with patients with both Medicaid and Medicare coverage should be included in the calculation of the DSH limit. CMS's response to FAQ 34 is as follows:

Section 1923(g) of the Act defines hospital-specific limits on [federal financial participation] for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligible when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligible. In calculating the Medicare payment for services, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligible.

http://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf.

On August 15, 2016, Defendants published a notice of proposed rulemaking, "clarifying that the hospital-specific DSH limit is based only on uncompensated care costs." 81 Fed. Reg. 53980, 53981 (Aug. 15, 2016). The notice specified that the proposed rule was not intended to

change the substance or operation of the 2008 Rule, but rather that the proposed rule would change the 2008 Rule's text in order to make more explicit the Secretary's "existing interpretation that uncompensated care costs include only those costs for Medicaid eligible individuals that remain after accounting for payments received by hospitals by or on behalf of Medicaid eligible individuals, including Medicare and other third party payments that compensate the hospitals for care furnished to such individuals." 81 Fed. Reg. 53980, 53981 (Aug. 15, 2016).

On April 3, 2017, after receiving various comments from the public, Defendants published a final rule adopting the proposed rule ("the Final Rule"). The Final Rule amends 42 C.F.R. § 447.299 to state that "costs incurred . . . [a]re defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance." 42 C.F.R. § 447.229(c)(10)(i).

The Final Rule took effect on June 2, 2017, and states that it provides clarification, such that there is "no issue of retroactivity, or a need for a transition period." 82 Fed. Reg. 16115, 16118.

The State of Missouri participates in the Medicaid program. Missouri's state plan provides that overpayments of DSH funds revealed by an audit will be returned to the State and redistributed proportionately among other DSH hospitals that are below their respective HSLs. The state plan further provides that in the event that the State cannot redistribute any portion of the recouped overpayments, the State will return the funds to CMS.

## LEGAL STANDARD

Generally, a party is entitled to summary judgment if it shows there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In this case,

however, the parties agree there is no genuine issue of material fact and this case presents purely legal issues. (Doc. #39 at 8; Doc. #42 at 27).

The parties also agree that the legal issues presented arise under the Administrative Procedures Act, 5 U.S.C. § 500, *et seq.* ("APA"). Under the APA, judicial review of an agency decision is limited. <u>Voyageurs Nat'l Park Assoc. v. Norton</u>, 381 F.3d 759, 763 (8th Cir. 2004). The scope of judicial review of an agency decision is as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Agency decisions are entitled to "a high degree of deference." <u>Voyageurs</u>, 381 F.3d at 763 (quoting <u>Sierra Club v. Envtl. Prot. Agency</u>, 252 F.3d 943, 947 (8th Cir. 2001). "If an agency's determination is supportable on any rational basis, [this Court] must uphold it." <u>Voyageurs</u>, 381 F.3d at 763 (citing <u>Friends of Richard-Gebaur Airport v. FAA</u>, 251 F.3d 1178, 1184 (8th Cir. 2001); <u>Creighton Omaha Reg'l Health Care Corp. v. Bowen</u>, 822 F.2d 785, 789 (8th Cir. 1987) (citing <u>Blue Cross Assoc. v. Harris</u>, 622 F.2d 972, 978-79 (8th Cir. 1980) ("A reviewing court should not reject reasonable administrative interpretation even if another interpretation may also be reasonable."). By contrast, "[a]n agency interpretation, however, that is plainly erroneous or inconsistent with the regulation must be reversed." <u>Creighton</u>, 822 F.2d at 789.

## DISCUSSION

Both the MHA and Defendants assert a right to summary judgment based on the same facts and the same law. In the administrative law context, "[t]he court's job on summary judgment is only to determine whether the Secretary's policy was consonant with her statutory powers, reasoned, and supported by substantial evidence in the record." <u>N.H. Hosp. Ass'n v. Burwell</u>, Civ. No. 15-cv-460-LM, 2017 WL 822094, at *1 (D.N.H. Mar. 2, 2017) (citing <u>Assoc. Fisheries of Me., Inc. v. Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997)). This Court must determine whether the policies set forth in the FAQs 33 and Final Rule are proper under the APA.

The MHA argues: (1) the Final Rule and FAQs are contrary to the unambiguous language of the Medicaid Act and are in excess of Defendants' statutory authority; (2) the FAQs are unlawful as non-compliant with the APA's notice-and-comment procedures; and (3) the FAQs violate the APA because they conflict with the unambiguous language of the 2008 Rule. (Doc. #39).

Defendants argue: (1) the MHA lacks standing; (2) the Final Rule and FAQs are consistent with the unambiguous language of the Medicaid Act and are within Defendants' statutory authority; (3) the FAQs were not subject to the APA's notice-and-comment procedures; and (4) the FAQs are consistent with the unambiguous language of the 2008 Rule. (Doc. #42).

As an initial matter, the Court must address Defendants' argument that the MHA lacks standing to challenge the policies at issue. <u>City of Clarkson Valley v. Mineta</u>, 495 F.3d 567, 569 (8th Cir. 2007).

Defendants argue the MHA lacks standing to bring suit because the complaint does not include specific allegations about which association member hospitals suffered harm or will suffer harm as a consequence of the FAQs or Final Rule. Defendants argue the MHA has not established Article III standing because although the MHA identifies several member hospitals that will be injured by the policy articulated in the Final Rule and in the FAQs, the MHA has not provided admissible evidence of any member hospital's particularized injury.

The issue of "standing is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." <u>Id.</u>, 495 F.3d at 569. "To show standing under Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." <u>Iowa League of Cities v. Envtl. Prot. Agency</u>, 711 F.3d 844, 869 (8th Cir. 2013). With respect to the injury in fact requirement, a plaintiff must establish an injury "that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000).

Because the MHA rather than an individual hospital is the plaintiff in this case, "it also must prove associational standing." <u>Iowa League</u>, 711 F.3d at 869. "An association has standing to bring suit . . . when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Id.</u> The MHA need only establish that any one of its member hospitals would have standing. <u>Id.</u> (citing <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975)).

The APA provides a cause of action for judicial review to anyone "suffering a legal wrong because of an agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702. "When the suit is one challenging the legality of government action or inaction . . . [and] a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of someone else . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561-62 (1992). While at the pleading stage a plaintiff may establish standing through "general factual allegations of injury," "to survive a summary judgment motion, 'he must set forth [standing] by affidavit or other evidence specific facts.'" <u>Iowa League</u>, 711 F.3d at 869 (citing <u>Mineta</u>, 495 F.3d at 569).

In the amended complaint, the MHA alleges it is a not-for-profit corporation that is comprised of 145 Missouri hospitals, and many of its member-hospitals rely heavily on the DSH program to offset financial losses incurred in providing care to Medicaid-eligible patients who are uninsured. The MHA alleges that the policy set forth in the FAQs and in the Final Rule will

have significant impact on the MHA member hospitals who rely on federal funds to ensure the hospital's ability to provide quality care.

The MHA filed with its motion for summary judgment a declaration from Kimberly Duggan, the Vice President of Medicaid and the Federal Reimbursement Allowance at the MHA Management Services Corporation. (Doc. #40-1). The MHA asserts Duggan's declaration authenticates its statement of material facts, and that this authentication is rooted in knowledge acquired through Duggan's role managing MHA members' issues relating to the Medicaid program.

Additionally, the MHA filed the declaration of Larry Kayser, Vice President of Finance at one of the MHA's member hospitals. Kayser's declaration provides that Barnes Jewish Hospital in St. Louis, Missouri, "will be subject to the recoupment of $5.9 million for fiscal year 2011" relative to the policy articulated in the Final Rule and the FAQs. (Doc. #45-1).

In this case, the MHA has provided sufficient evidence to establish that at least one of its member hospitals will be subject to recoupment of $5.9 million resulting from the policy articulated in the Final Rule and the FAQs, unless the Court finds that the policy violates the APA, such that the member hospital will not be subject to recoupment and injury will not result. For these reasons, the Court finds the MHA has established Article III standing.

A. **THE MHA IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I RELATIVE TO THE FAQS.**

The MHA asserts a right to summary judgment on Count I because the policy set forth in the FAQs was not established through proper procedure under the APA.

The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(D). An agency "rule" is "an agency statement of general or particular

applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). The APA provides that "notice of proposed rule making shall be published in the Federal Register . . . ." 5 U.S.C. § 553(b). When such notice is required, "the agency shall give interested persons an opportunity to participate in the rule making . . . ." 5 U.S.C. § 553(c). "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the force and effect of law." Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015) (Chrysler Corp. v. Brown, 441 U.S. 281, 302-303 (1979)).

However, "[n]ot all rules must be issued through the notice-and-comment process. Section 4(b)(A) of the APA provides that, unless another statute states otherwise, the notice-and-comment requirement does not apply to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." Perez, 135 S. Ct. 1199, 1203-04 (citing 5 U.S.C. § 553(b)(A)). The APA does not define the term "interpretive rule," but such a rule is characterized as one that is "issued by an agency to advise the public of the agency's construction of the statutes and the rules which it administers." Id. at 1204. "Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Id.

"The critical distinction between legislative and interpretive rules is that, whereas interpretive rules simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties, a legislative rule imposes new rights or duties." Iowa League, 711 F.3d at 873. A legislative rule results "[w]hen an agency creates a new legal norm based on the agency's own authority to engage in supplementary lawmaking, as delegated from Congress . . . ." Id. "Expanding the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously

created, is the hallmark of legislative rules." Id. "Whether or not a binding pronouncement is in effect a legislative rule that should have been subjected to notice and comment procedures thus depends on whether it substantively amends or adds to, versus simply interpreting the contours of, a preexisting rule." Id.

In this case, the FAQs provide that a state calculating the DSH limit for a particular hospital must subtract, from the costs incurred in providing hospital services to Medicaid-eligible patients, any payments received from private insurers and Medicare. The parties do not dispute that the FAQs did not go through notice-and-comment procedures.

Defendants assert that the FAQs are interpretive because they clarify how the 2008 Rule applies with respect to a state's calculation of a hospital's specific limit under the DSH program for auditing purposes. Although Defendants' characterization of the FAQs as interpretive, as opposed to legislative, is relevant, it is not dispositive since "whether and when an agency must follow the law is not an area uniquely falling within its own expertise . . . ." Iowa League, 711 F.3d at 872.

Under the 2008 Rule, a DSH hospital's uncompensated care costs is "the total cost of care of furnishing . . . services to Medicaid eligible individuals and to individuals with no source of third party coverage . . . less the sum of regular [non-DSH] Medicaid . . . payments." 42 C.F.R. § 447.299(c) (2008). The 2008 Rule matches the calculation for the HSL set forth by statute. 42 U.S.C. § 1396r-4(g)(1)(A).

The FAQs, however, provide that private insurance payments and Medicare payments received by a DSH hospital are to be considered in calculating a hospital's uncompensated care costs. Inclusion of these categories of payments is not contemplated by either the Congressionally-established HSL calculation or the 2008 Rule relating to § 1396r-4(g). Tenn.

Hosp. Ass'n v. Price, No. 3:16-cv-3263, 2017 WL 2703540, at *7 (M.D. Tenn. June 21, 2017) (citing Tex. Children's Hosp. v. Burwell, 76 F. Supp. 3d 224, 230 (D.D.C. 2014)). Consequently, the Court finds that the FAQs are legislative in nature.

Because the FAQs substantively impact the HSL calculation, as opposed to simply interpreting the contours of the statute and the 2008 Rule, the Court concludes the FAQs were subject to notice-and-comment procedures. Because there is no dispute that Defendants did not undertake such procedures relative to the FAQs, the MHA is entitled to summary judgment on Count I. The Court concludes the FAQs are set aside based on Defendants' failure to observe procedure required by law. 5 U.S.C. § 706(2)(D).

## II. THE MHA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II RELATIVE TO THE FAQs.

Because the FAQs are set aside for failure to observe required procedure, analysis of Count II is set forth for purposes of discussion only.

In Count II, the MHA asserts a right to summary judgment because the FAQs are in excess of Defendants' statutory authority, such that the FAQs should be set aside on this basis under § 706(2)(C). As discussed above, the FAQs substantively alter the formula for the calculation of uncompensated care costs for DSH hospitals. The consideration of private insurance payments and Medicare payments in the calculation of uncompensated care costs expands the Congressionally-established calculation set forth in § 1396r-4(g). Defendants lack authority to materially alter the statutory HSL calculation. Moreover, the inclusion of private insurance and Medicare payments in the calculation of the HSL as set forth in the FAQs is invalid as contrary to the statutory language of § 1396r-4(g), as discussed in Section IV. Therefore, the MHA is entitled to summary judgment on Count II, and the FAQs are also substantively invalid pursuant to § 706(2)(C).

### III. THE MHA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III RELATIVE TO THE FAQS.

Because the FAQs are set aside for failure to observe required procedure and because they are in excess of Defendants' statutory authority, analysis of Count III is included for purposes of discussion only.

In Count III, the MHA asserts a right to summary judgment because the FAQs are inconsistent with the unambiguous language of 42 U.S.C. § 1396r-4(g)(1)(A). The Court concludes the MHA is entitled to summary judgment on Count III pursuant to § 706(2)(A) because the policies set forth in the FAQs are contrary to the unambiguous language of § 1396r-4(g), as discussed with reference to the Final Rule in Section IV below.

### IV. THE MHA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT IV RELATIVE TO THE FINAL RULE.

The Final Rule, set forth in pertinent part as follows, went into effect on June 2, 2017:

Total Cost of Care for Medicaid IP/OP Services. The total annual costs incurred by each hospital for furnishing inpatient and outpatient hospital services to Medicaid eligible individuals. The total annual costs are determined on a hospital-specific basis, not a service-specific basis. For purposes of this section, costs—

(i)     Are defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.

42 C.F.R. § 447.299(c)(10).

In Count IV, the MHA alleges the Final Rule should be set aside because it is in excess of Defendants' statutory authority. 5 U.S.C. § 706(2)(C). The MHA asserts that the Medicaid Act, as drafted by Congress, provides that uncompensated costs for determining a DSH hospital's specific limit are statutorily defined as costs incurred through furnishing services to Medicaid-eligible patients, less other non-DSH Medicaid payments received. Stated differently, the MHA asserts that Medicaid costs that are not otherwise reimbursed through Medicaid are treated as

uncompensated under the statutory scheme. The formula asserted by the MHA as dictated by statute is as follows:

> *Total Cost of Treatment for Medicaid-eligible Patients - Total Payments from Medicaid not under the DSH Program = Medicaid Shortfall.*

Defendants argue this Final Rule is within Defendants' statutory authority because the statutory language gives the Secretary discretion to determine the definition of costs. Defendants assert, therefore, that the Final Rule is a reasonable exercise of agency authority because Defendants are authorized to limit uncompensated costs to those for which a hospital has not received any payments through any avenue.

The formula asserted by Defendants is as follows:

> *Total Cost of Treatment for Medicaid-eligible Patients - (Total Payments from Non-DSH Medicaid + Total Payments Received for Medicaid-eligible Treatments from Medicare and Private Insurance, if Any) = Medicaid Shortfall.*

The parties agree that <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u> directs the Court's analysis with respect to the Final Rule. 467 U.S. 837 (1984). The first question is "[w]hether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43. If, and only if, the statute at issue is silent or ambiguous with respect to the precise issue, the Court proceeds to the second step of <u>Chevron</u> analysis. <u>Id.</u> The second question asks "whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> at 843. The agency's interpretation of an ambiguous statute is afforded substantial deference, "so long as the construction is a reasonable policy choice for the agency to make." <u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 986 (2005).

The Court must first determine "whether Congress has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842. The statute setting forth the DSH hospital-specific calculation is as follows:

§ 1396r-4. Adjustment in payment for inpatient hospital services furnished by disproportionate share hospitals

[. . . .]

(g) Limit on amount of payment to hospital
     (1) Amount of adjustment subject to uncompensated costs
         (A) In general

A payment adjustment during a fiscal year shall not be considered to be consistent with [the DSH payment adjustment] with respect to a hospital if the payment adjustment exceeds the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year. For purposes of the preceding sentence payments made to a hospital for services provided to indigent patients made by a State or a unit of local government within a State shall not be considered to be a source of third party payment.

42 U.S.C. § 1396r-4(g)(1)(A).

The MHA argues "net of payments under this subchapter" communicates Congress's intent that only non-DSH Medicaid payments received should be subtracted from a hospital's total Medicaid treatment expenditure. The MHA argues that to find otherwise renders the language "payments under this subchapter" impermissibly superfluous. Further, the MHA argues that this construction is supported by adjacent provisions in the Medicaid Act, legislative history, and the purposes of the Medicaid Act and the DSH program.

Defendants counter that the statute is clear that only uncompensated costs should be included in calculation of the HSL, as evidenced by "costs incurred . . . as determined by the Secretary." Defendants assert that the statute makes clear that the HSL adjustment is subject to

uncompensated costs, and legislative history demonstrates congressional intent that DSH payments be limited by "payments received from or on behalf of Medicaid and uninsured patients." Additionally, Defendants argue the 2008 Rule preamble states that uncompensated care costs are intended to include only unreimbursed costs of providing care to Medicaid eligible patients. In sum, Defendants argue the statute is unambiguous that costs for which a hospital has received payment from a third party are not costs for which the hospital stands uncompensated, and the statutory language authorizes the Secretary to determine which costs should and should not be included in the HSL calculation.

In the Court's view, the language of 42 U.S.C. § 1396r-4(g)(1) is unambiguous on how states should calculate HSL under the DSH program. The statute states that the DSH adjustment to which a hospital is entitled is subject to uncompensated costs, which is the total cost incurred by the hospital in furnishing hospital services, as determined by the Secretary, to Medicaid-eligible patients, less non-DSH payments under the Medicaid Act. The Court agrees with the MHA that the unambiguous language of the statute explains the only payments that offset a hospital's Medicaid costs are non-DSH Medicaid payments.

While "the phrase 'as determined by the Secretary' shows that Congress has provided an express delegation of authority to the agency to elucidate a specific provision of the statute," § 1396r-4(g)(1)(A) does not require "the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." N.H. Hosp. Ass'n v. Burwell, Civ. No. 15-cv-460-LM, 2017 WL 822094, at *1 (D.N.H. Mar. 2, 2017); Chevron, 467 U.S. at 843. To the contrary, the language of the statute sets forth the formula through which the HSL is properly calculated.

This reading of the statute is otherwise supported by context. First, "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001). Defendants' reading of the statute does not satisfy this principle of statutory construction. Defendants argue that uncompensated costs are those "costs incurred . . . as determined by the Secretary," and the Secretary is authorized to determine whether payments from Medicare or private insurance should be subtracted from the total cost of treatment provided to Medicaid-eligible patients in the HSL calculation. But this construction renders the phrase "payments under this subchapter" superfluous because under Defendants' reading, the Secretary would be authorized to reduce the hospital-specific limit by any category of incoming funds that a DSH might receive. While the Secretary may be authorized to define "costs," the authority stops short of defining "payments."

Moreover, the last sentence of § 1396r-4(g)(1)(A) indicates that Congress considered the impact of third party payments on the HSL, and determined that certain costs from "a State or unit of local government" provided to indigent patients must be included in the hospital's total cost of furnishing Medicaid services for the year. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983); Children's Hosp. of the King's Daughters, Inc., v. Price, No. 2:17cv139, 2017 WL 2936801, at *22 (E.D. Va. June 6, 2017).

Finally, the legislative history of 42 U.S.C. § 1396r-4(g) indicates Congress's intent to set forth a specific formula to ensure that DSH payments did not exceed the costs of providing care to Medicaid and uninsured patients minus other Medicaid payments. H.R. Rep. No. 103-213, at

835 (Aug. 4, 1993), reprinted at 1993 U.S.C.C.A.N. 1088, 1054, 1993 WL 302291. Additionally, the DSH program was implemented to support hospitals providing care to "high volumes of Medicaid patients in meeting the costs of providing care to the uninsured patients they serve, since these facilities are unlikely to have large numbers of privately insured patients through which to offset their operating losses on the uninsured." H.R. Rep. 103-111 (1993). By only including Medicaid payments in the calculation of the HSL, Congress ensured that DSH payments supplement non-Medicaid revenue sources.

For all of these reasons, the Court concludes 42 U.S.C. § 1396r-4(g)(1)(A) is unambiguous that the calculation of a DSH hospital's HSL does not involve consideration of private insurance or Medicare payments, and a DSH hospital's total uncompensated costs of care for calculating the HSL is reduced only by the total of other Medicaid program payments. Because § 1396r-4(g) is unambiguous, the Court need not consider the second step of <u>Chevron</u>. The MHA is entitled to summary judgment that the Final Rule is in excess of Defendants' statutory authority and the Final Rule is set aside.

## V. THE MHA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V RELATIVE TO THE FINAL RULE.

In Count V, the MHA seeks declaratory judgment that Defendants may not retroactively enforce a policy requiring the inclusion of private insurer and Medicare payments in calculating the Medicaid Shortfall component of the HSL.

This Court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. §2201. Based on the conclusions above, Defendants may not enforce the Final Rule, retroactively or otherwise. The MHA is entitled to summary judgment on Count V. Accordingly, it is hereby

ORDERED Plaintiff's Motion for Summary Judgment (Doc. #38) is GRANTED. Defendants are enjoined from enforcement of the FAQs and the Final Rule. It is further

ORDERED Defendants' Motion for Summary Judgment (Doc. #41) is DENIED.

IT IS SO ORDERED.


DATED: <u>February 9, 2018</u>          <u>/s/ Brian C. Wimes</u>
                                        JUDGE BRIAN C. WIMES
                                        UNITED STATES DISTRICT COURT